[No. 2040.]

### WASH WASHINGTON *v.* THE STATE.

1. MURDER — EVIDENCE. — See the opinion *in extenso* for declarations of the deceased which, upon a murder trial, were properly admitted as part of the *res gestœ*, though not made in the presence of the accused nor at the immediate scene or instant of the homicide.

2. SAME. — Three witnesses for the State testified that they heard the fatal shot and the outcry of the deceased, and ran immediately to where the deceased was lying, and asked him who shot him, and that, in reply, he named the defendant. The answer was objected to upon the ground that it was embraced within the rule qualifying dying declarations, which were admissible only after the laying of the proper predicate. *Held*, that the evidence was strictly *res gestœ*, and was therefore properly admitted.

3. PRACTICE — JURY LAW. — The verdict of a jury is not to be impugned merely because, during its deliberations, the jury were in charge of a deputy sheriff who testified on the trial as a witness for the State.

4. MURDER — FACT CASE. — See the statement of the case for evidence *held* sufficient to support a capital conviction for murder.

APPEAL from the District Court of Falls. Tried below before the Hon. B. W. Rimes.

The indictment charged the appellant with the murder of Willis Durden, in Falls county, Texas, on the 27th day of May, 1885. His trial resulted in his conviction of murder in the first degree, the death penalty being awarded.

Flora Crockett was the first witness for the State. She testified that she knew the defendant, and also the deceased in his life-time. They all lived on Mr. Austin Robinson's place, in the Brazos bottom, in Falls county, Texas. The witness was at home on the even-

ing of May 27, 1885, and saw both the defendant and the deceased on that evening. Just before dark she saw the deceased milking his cows at the end of the lane near witness's house. Defendant stopped and entered into conversation with the deceased, a part of which the witness heard. She heard him ask the deceased to go by Jane Clarkson's house and tell one Jesse Dupree, who lived there, to come to his house early the next morning and write a letter for him; to which the deceased replied, "all right." The defendant then left and went off in the direction of his house. The deceased, after the defendant left, milked his one remaining cow, turned his calves out, and, in his shirt sleeves, with a milk bucket on his arm, started horseback towards Jane Clarkson's house. Shortly after the defendant left the place where he had spoken to the deceased, but before the deceased finished his milking, the witness noticed some one stooping down in the oat-patch near by. It was too dark then for the witness to distinguish that person. A slough ran just in front of the witness's house, and the deceased's direct route home was down that slough, and not by Jane Clarkson's house. Albert Clarkson lived just across the lane from the witness, and Lloyd Brown lived between the houses of the witness and Jane Clarkson. Jane Clarkson lived about two hundred yards distant from the witness's house. The body of the deceased was found about the same distance from the witness's house. The defendant lived down the lane about one hundred and fifty yards from the witness. His house was somewhat nearer the cow pen. The deceased got through milking, and started towards Jane Clarkson's at "first dark." The night was cloudy, but the lightning flashed vividly and continuously, at intervals.

A short while after the deceased left the cow pen, and about long enough for him to have ridden to the point on the slough where his body was subsequently found, the witness heard the report of a gun, and immediately, from the same direction, the exclamation: "Oh! Please don't shoot me any more." Pinnine, a woman who lived with the defendant, Henry Green and the witness's husband were at witness's house at the time. Witness did not go to the body. Defendant had no gun when he stopped and talked with the deceased at the cow pen. Their talk, so far as the witness could determine from what she heard, was perfectly friendly.

W. P. Martin, constable of precinct number 3 of Falls county, Texas, was the next witness for the State. He testified that he went with the justice of the peace to Robinson's farm, where the homicide was committed, on the day of the inquest, which was the day after the killing. He drew the annexed diagram, which he knew to be correct.

Albert Clarkson was the next witness for the State. He testified that the deceased was at the place at the head of the lane where he usually milked his cows, on the evening of May 27, 1885. The witness did not see him, it then being dark, but recognized his voice. Soon after he heard deceased's voice he missed him from the cow pen, and presently heard the report of a gun down the slough in the direction of where he lived, and, at the same time, a cry of distress. Witness ran promptly to the place from which the cry proceeded, a few hundred yards distant, and found the deceased lying just in the edge of the water where the road from Jane Clarkson's house crossed the slough, going to the deceased's house. That point is marked "dead body" on the diagram. Witness occupied but few minutes going from his house to the point where the deceased lay. He was calling in distress when the witness reached him, and exclaimed: "Wash Washington has shot me!" He said, when the witness and others reached him, that he was very badly wounded, and asked to be taken home. The water in the slough was too deep to undertake to transport the deceased across it to his house, in his then condition, and, accordingly, he was taken back to Jane Clarkson's house, which was but a short distance off. While he was being taken to the house of Jane Clarkson, the deceased kept repeating, "Wash Washington has shot me," and kept it up persistently until he died, his voice growing weaker continually until his death, which occurred a few minutes after he was found, and had reached the house of Jane Clarkson. The growth to the left of the crossing of the slough, where the fatal shot was fired, was very thick. The ball entered the left side of the deceased. He was in his shirt sleeves and was unarmed, when shot. Jesse Dupree, Henry Green and Wash Mason were at the body when the witness reached it. Witness saw no tracks about the place of shooting, but did not examine for any. The night of the killing was a very cloudy one, but the lightning was rapid and vivid, and the witness knew that he could readily recognize any one whom he knew twenty or thirty steps off. Defendant was not to be found at home on the day after the killing, nor did the witness see him again until he had his examining trial in Reagan, on the 6th day of the following June.

Lloyd Brown testified that he was at home, on the Robinson farm, sitting at the supper table, when the fatal shot was fired. He paid but little attention to it until his wife insisted on his going out to see what it was about. When he got out on his gallery he heard some one in the direction of where the body was found, saying, "O Lordy!" This cry was repeated with little cessation so long as

the witness remained standing on his gallery. His wife insisted that witness should go and investigate the evident matter of distress, but witness was afraid to go. While on his gallery the witness heard some one running from the direction of the point where the shooting occurred towards his, witness's, house. That person, who was on foot, passed along the road between the houses of the witness and Jane Clarkson, and went on towards the defendant's house. The witness could swear only that the party who passed along the road in a run, as stated, was a man. The night was too dark for the witness to identify him, particularly as he crossed the road some distance from where the witness was standing. When the witness finally recognized the voice calling in distress as that of the deceased, he went to hunt him, and found him lying in the edge of the water at the point where the road between his own and the house of Jane Clarkson crossed the slough, and about fifty yards from his own, and a hundred yards from Jane Clarkson's house. He was still hallooing when witness arrived. Witness asked him what was the matter, and he said that Wash Washington had shot him, and repeated that statement at intervals until he died. Deceased was shot in the left side with buck shot. He was taken as soon as found to Jane Clarkson's house, and died within a very few minutes after his arrival there. The tracks of the man who fired the fatal shot were discovered under a tree to the left of and very near the place where the body was found. Several buck shot, the witness did not know how many, entered the left side of the deceased in a space that could be readily covered by a hat crown. When witness reached the body he found Henry Green, Jim Dupree, Wash Mason, Albert Clarkson and Pinnine Johnson present. The witness had never known of a disagreement or ill-feeling between the defendant and the deceased. They always conducted themselves in a friendly manner in the presence of the witness. Defendant left the country on the night that the shooting was done, and witness did not see him again until he was arraigned before the examining court in June, 1885.

Jane Clarkson was the next witness for the State. She testified that she was at home on the night of May 27, 1885. The deceased passed witness's house that evening, just before sundown. He was horseback and in his shirt sleeves. He had a milk bucket on his arm and went down to the head of the lane where he usually milked his cows. That point was about two hundred and fifty yards from the witness's house. The deceased passed back by the witness's house a few minutes after dark, stopped at the house and asked for

Jesse Dupree, the witness's cousin, who lived with her. Jesse went out, and the deceased told him, in witness's presence, that the defendant had asked him to tell Dupree to come to defendant's house early on the next morning, to write a letter for him. Dupree replied that it was impossible for him to go to defendant's house next morning, because he had to go to the prairie, but he would go to defendant's that night. Deceased replied that it would be of no use for Dupree to go to defendant's that night, as he, deceased, had just seen defendant going down the slough with his gun. Deceased then gave one of the children some milk and got on his horse and started home. He had been gone just about long enough to ride a hundred yards when the witness heard the report of a gun from the direction of the slough, followed by the exclamation: "O Wash! O Wash! Please Wash, don't shoot me any more!" Witness heard this cry with great distinctness, the stiff wind bearing the sound directly from the point where the shooting occurred to where the witness stood at her house, and hers was the nearest house except the deceased's to the slough crossing where the shooting occurred. Deceased kept up the hallooing for some time after the shot was fired. The water in the slough was up that night belly deep to a horse, and for that reason, the slough being between the houses, the deceased was brought to the witness's house. Jesse Dupree wanted to go to the place of the shooting as soon as the gun fired, but was prevented by the witness, as she was afraid to be left alone. He went to the deceased in a few minutes, and witness went to Lloyd Brown's house, a distance of about two hundred yards. *En route* to Brown's house, the witness heard and saw a man running from the direction of the point where the deceased was found. He ran to the road at a point between the houses of the witness and Lloyd Brown. The witness knew of a verity that that man was the defendant. Witness stooped down to avoid being seen by him, as she was afraid. He was in his shirt sleeves and carried a gun. The moon was out as he passed, and the flashes of lightning were frequent and vivid. After he crossed the road he continued to run in the direction of his own house. Witness saw no more of him until he was arraigned before the examining court in June, 1885. The witness did not see the defendant's face as he passed in flight, but she saw his form, his shape, his size, and, as she had known him for a long time, she knew him by his general appearance and manner of carrying himself.

After the defendant passed beyond the road in his flight, witness went on to Brown's house. She found Leah, Lloyd's wife, at home,

but Lloyd had already gone to the point where the deceased was lying. The party reached witness's house with deceased before the witness got back home, and he was there dead when the witness arrived. On the Sunday preceding the shooting, which occurred on Wednesday night, the witness heard the defendant declare to some one that the deceased did nothing but circulate in the neighborhood and foment disturbances and quarrels between the people; that he, the defendant, was tired of it, and that he intended to "squat" for the deceased. With this exception, and a slight misunderstanding about a gun, no ill-feeling had ever existed between defendant and deceased, so far as the witness knew. The relations between the witness and the defendant had always been of a friendly character. The witness said nothing on the examining trial about having seen the defendant running off, because she was then afraid to give that testimony, because she was not asked, and because she knew there would be another trial upon which she could testify. A great many threats had been uttered against the State's witnesses, and witness was afraid, even on this trial, of the effect upon her of her testimony.

Leah Brown testified, for the State, that she was at home when the shot was fired. She heard it, and also the cries of distress, but, because of the direction of the prevailing wind, failed to recognize the voice. After some persuasion on her part, the witness's husband, Lloyd Brown, went off in the direction of the point where the shot was fired. Jane Clarkson, the previous witness for the State, reached the witness's house a few minutes after the shot was fired. Just before Jane's arrival, a man in flight crossed the road between witness's and Jane Clarkson's house, going in the direction of the defendant's house. He passed at too great a distance for witness to recognize him, but near enough for witness to see that he was a man.

Jesse Dupree was the next witness for the State. He testified that he was at the house of his cousin, Jane Clarkson, when the deceased was shot on the night of May 27, 1885. The deceased came by Jane Clarkson's house just before the fatal shot was fired, and told witness that he had recently seen the defendant at the cow pen, and that the defendant asked him to stop at Jane Clarkson's and tell witness to go to his, defendant's, house early on the next morning to write a letter for him. Witness replied to deceased that he could not go to defendant's next morning, as he had to go to the prairie, but that he would go that night. Deceased replied that it would do no good to go that night, as he had just seen the

defendant going down the slough with a gun on his shoulder. Deceased, who was on horseback, then rode off towards his house, just across the slough. "Down the slough" was in the direction of the deceased's house from the cow pen where the deceased usually milked his cows. Deceased had been gone from Jane's house on his way home but a very short time when the witness heard the report of a gun, and the voice of the deceased, which he instantly and perfectly recognized, calling in distress, "O Lordy, Wash! O Wash! Don't shoot me any more, Wash!" This hallooing was kept up for some little time. Witness wanted to go to deceased's relief without a moment's delay, but his cousin Jane, who seemed to be afraid to be left alone, caught and held witness, and begged witness not to go. After a short time witness got loose from Jane and ran down to the crossing of the slough, where he found the deceased, lying wounded, just in the edge of the water. Henry Green was the first, and the witness the second, person to reach deceased. Deceased kept repeating "Wash Washington has shot me." He was very badly wounded in the left side, that side being penetrated by ten or fifteen buck shot, such as the witness knew as low mould buck shot. Deceased was taken to the house of Jane Clarkson, where he died in a very short time, before which, however, the witness started to summon a doctor. The lightning on that night was frequent and vivid, and of such character as to enable the witness to recognize a person at the distance of thirty or forty feet. Witness examined the ground about the place of the shooting next morning, and found tracks leading from that point diagonally across the road between Jane Clarkson's and Lloyd Brown's houses. The tracks were of a number eight or nine shoe. They passed through plowed ground, and were evidently made by a man in a fast run. Witness had never known of any ill-feeling between the defendant and the deceased.

Quince Kelly testified, for the State, that he lived about six hundred yards distant from the house of the deceased. Deceased and witness went to the town of Reagan together on the 27th day of May, 1885, and returned together some little time before sundown. Witness was suffering a great deal from neuralgia and retired directly he got home. Some time after he retired he heard the report of a gun fired at some point near the deceased's house. Some time after that, about 9 o'clock, the defendant came to the witness's house and called for witness. Witness asked him what was the matter. He replied by telling witness to come to him, that he wanted to talk to witness and must see him. Witness got up and went out of

his house and found the defendant on horseback, with something in his hand. Witness asked what he had with him. He replied that it was the witness's hoe, which he had borrowed some time before and desired to return. He then asked the witness where his, witness's, daughter Pinnine was. Defendant and Pinnine had been living together as man and wife, but a short time before had quarreled and Pinnine had left him. Pinnine passed as the defendant's wife, but had never been married to him. Witness told defendant that he thought Pinnine was at Lloyd Brown's house. He replied that he had sought her there but had not found her. He then said that he had just shot and killed the deceased, and was going to leave the country, and that his purpose in seeing Pinnine, if he could find her, was to get her to go to his house and get some things for him; that he was afraid if he left them there that Eph Durden, who was living with him, would steal them. Witness then asked him if in fact he had killed deceased, and he replied that he had and was going to leave. He then rode off in the direction of the prairie, and witness saw him no more until he was arraigned in the examining court. Witness had known the defendant and deceased about five years, and had never known them to have trouble but once, and that arose in a dispute over a gun during the fall of 1884. Deceased claimed that Eph Durden and defendant stole his gun. On the occasion of the quarrel about the gun, defendant told deceased that he had been informed that deceased accused him of stealing his gun, and that he was a d—d liar. Defendant started threateningly at deceased, but witness interfered and prevented other results. They made friends immediately after that quarrel, and deceased gave defendant a half bushel of meal when the latter started home. Since then, so far as witness knew, or could tell from their conduct towards each other, they had been perfectly friendly.

Cross-examined, the witness said that on their way to Reagan on May 27, 1885, witness and deceased got to talking about the gun matter, when deceased said that defendant did not steal it, but that Eph Durden did, and that, when he spoke to Eph about it, Eph threatened to kill him about the gun.

Davilla Kelly, the wife of the witness Quince Kelly, testified, for the State, that she was at home on the night of May 27, 1885. Her husband went to bed before sundown because of feeling unwell. Witness heard the report of a gun that night, in the direction of the point where the deceased was subsequently found wounded. Sometime later, witness could not say how long, the defendant came to her house horseback. He stopped in the yard near the well and

called for the witness's daughter Pinnine, with whom, until she re-cently quit him, he had been living. Receiving no answer, defend-ant called for the witness, and witness told him that Pinnine was at Lloyd Brown's house. He then went off very fast in the direction of Brown's house, but shortly returned and called for Quince. Wit-ness opened her window in order to hear what he had to say. She heard the defendant tell Quince that he had shot and killed Willis Durden that night, and that he was going to leave. Before he left, but after Quince went back into the house, defendant said that the deceased had been stirring up some trouble about a woman, and that he had killed him for it, and was now leaving the country. This re-mark was made to witness in answer to a question she asked. De-fendant then rode off.

Deputy Sheriff J. T. Barlow testified, for the State, that a few days after the killing a telegram was received at the sheriff's office from Ennis in Ellis county, asking if a reward had been offered for the man who killed Willis Durden. Witness replied in the negative, but to hold the man for murder. He went to Ennis the next morn-ing, and received the defendant from the custodian of the Ennis calaboose.

Phil Carter testified, for the State, that his wife was the defend-ant's sister. Witness lived on the prairie not a great distance from Reagan. Defendant came to witness's house on the night that de-ceased was killed, reaching there about 10 o'clock, which was after the witness had retired. He said that he was going away and wanted $3 which witness owed him. Witness did not have the money, and did not care to get up. Witness asked him what was the matter. He replied that he had had a difficulty with some one in the bottom, but called no names. Defendant then went into an adjoining room with his sister, the witness's wife, and witness heard them talking. He heard defendant give his sister some instructions about a few cattle he owned. Witness then went to Mr. G. Hayes's house to get the money due defendant. Mr. Hayes sent witness to his brother, who gave witness $3. Witness did not tell Mr. G. Hayes on that night that defendant said that he had killed a man in the bottom, and was leaving the country. Witness gave the money to defendant, and he left.

Grider Hayes testified, for the State, that Phil Carter came to him about 11 o'clock on the night of May 27, 1885, and asked for $3. The witness did not feel like getting up, and asked him what was the matter. Phil said that defendant had killed another negro in the bottom, and wanted the money to get away on. Phil was then

in witness's employ. Witness sent him to his brother, who paid him the $3. The State rested.

Pinnine Johnson was the first witness for the defense. She testified that for some time and until within a short time of the homicide, she had been living with and cooking for the defendant. She was at Flora Crockett's house on the night of the killing. She did not see the defendant on that night, but got word next morning that the defendant wanted her to go to his house and look after the things which he had left. Defendant and Eph Durden lived in the same house. Witness went to that house on the next morning, and found the defendant's gun behind Eph's meat box. She also found, under the head of Eph's bed, a black silk cap which the defendant usually wore on Sundays. So far as the witness was ever able to discover, the defendant and the deceased were as intimate and friendly as two brothers. Eph Durden was at the house of the deceased, who was his brother, on the Sunday before the killing, and the witness afterwards heard Eph cursing and abusing deceased's wife, about which he and deceased had some words. She had also heard Eph threaten to kill the deceased. Witness saw the defendant some time during the evening of the fatal day. He was then in his shirt sleeves and wore a straw hat.

Cross-examined, the witness admitted that she felt a very great interest in the issue of this case. She had sworn that she was the defendant's wife, though she had never married him. She had been to the jail to see the defendant on an average of about twice a week since the defendant's incarceration. People generally regarded her as defendant's wife.

Bill Sterling testified, for the defense, that he was at deceased's house some time during the day on May 27, 1885, and then heard Eph Durden tell the deceased that he, Eph, was going to kill him, deceased, before Sunday night. Eph and deceased were on bad terms about a gun which the deceased, on the day before, had accused Eph of stealing from him. Witness went to the place of the killing on the morning after the killing, and found tracks under a black walnut tree, some fifteen steps from the left hand side of the road, and near the slough. Those tracks were made by a large flat-heeled shoe. Witness followed that track into a cotton patch, across some plowed ground, and about sixty yards in the direction of Lloyd Brown's house. That track, and the impression of the broad flat heel, were very plain. Defendant usually wore a pair of boots with a sharp pointed heel of about a number eight. The track described was made by a shoe about number nine in size.

Cross-examined, the witness said he knew nothing of the killing until late on the morning after it occurred. Witness traced the tracks alone. Hé was a good friend of the defendant. Witness could not say who made the tracks he trailed. He did not know how many pairs of shoes the defendant had.

Nelson Washington, the defendant's brother, testified in his behalf that the defendant almost always wore high-heeled boots, and owned such a pair, which the witness saw on the Sunday prior to the killing. Defendant may have owned boots or shoes of a different pattern, so far as the witness knew.

Perry Stroud testified, for the defense, that he was with the defendant when the shot which killed the deceased was fired. He heard the report of the gun and the cries of distress. At that time the witness and the defendant were at the oat patch, where the defendant had taken his horse to stake out. The defendant stood inside of the oat patch, and the witness in the road on the outside, the patch fence between them. Witness and defendant talked at that place for some five minutes after the gun fired, when witness went home, and the defendant started, whistling, towards his home. The point in the oat patch where witness and defendant stood when the shot was fired was not more than two hundred yards from defendant's house.

Cross-examined, the witness said that he lived on the Guffy farm, about three miles distant from the defendant's house; that he and defendant had long been, and still were, warm personal friends. Witness left the Guffy farm on the evening of May 27, 1885, to drive three hogs to the prairie beyond Big creek, to remove them from danger of high water. Water generally was not very high on that day, and witness had to swim only one creek with the hogs. He started with the hogs about an hour and a half before sundown. He took them to a point about three miles distant. He went over the Cluck bridge across Big creek, and got out on the hills just at sundown, and there left the hogs. Witness then (about sundown) started back by way of defendant's house to get some clothes which Pinnine was washing for him. Going back witness had to swim several creeks, taking his clothes off to do so. From the point where witness left the hogs to the point where he met defendant and was talking to him when the gun fired was about two and a half miles. Witness took the return route described for no other reason than to get his clothes. He went home without them. It was about three hundred yards from the oat patch to Quince Kelly's, where Pinnine was then staying. Witness did not tell Jane Clarkson, on the Sunday

after the killing, *en route* from Bethlehem church on the Watson farm, that he did not hear of the killing of deceased until the next day, and that he did not know anything about the killing, and that he did not see the defendant on the night of the murder. He did not ask Jane to tell him all about the killing. The defense closed.

W. P. Marlin was the first witness introduced by the State in rebuttal. He testified that he was raised near Big creek, and was familiar with the country about Cluck's bridge crossing. The whole country adjacent to that crossing was very much overflowed on the 27th day and night of May, 1885. No one could, as claimed to have been done by Stroud, have driven hogs across that creek at that point to the hills, without swimming at least a mile.

D. H. Boyles testified, for the State, in rebuttal, that he held the inquest over the body of deceased on the morning after the murder. He trailed tracks from the point of the killing diagonally across the country towards the road leading from Jane Clarkson's house to Lloyd Brown's. The tracks were too indistinct for measurement, the imprint of the toes only being visible. No impression of a heel could be found on the trail. Witness and his party crossed Big creek on that morning at the Summers bridge, which was much higher than the bridge at Cluck's crossing. Witness constructed the Cluck bridge, and knew the bottom at that point to be very low and flat, and knew from the height of the water at the Summers crossing on the morning of May 28, 1885, that on the night before the water must have been all over the bottom at Cluck's crossing.

Jane Clarkson testified, for the State, in rebuttal, that she went home from the Bethlehem church, on the Watson farm, with Perry Stroud, on the Sunday after the murder of the deceased. Stroud told witness on that occasion that he was at home on the night of the murder, and knew nothing about it; that he had not seen the defendant, and asked the witness to tell him all about the killing, assuming that, as deceased died at her house, she knew all about it.

The motion for new trial raised the questions discussed in the opinion.

*Oltorf & Harlan,* for the appellant.

*J. H. Burts,* Assistant Attorney-General, for the State.

HURT, JUDGE. This is a conviction for murder of the first degree, the punishment fixed by the verdict of the jury being death.

It is insisted that the court below erred in admitting in evidence,

over objection of the defendant, a conversation between the deceased and the witness Jesse Dupree, as follows:

"He (witness) was at Jane Clarkson's house on the evening deceased was killed, and that deceased came by said house on his way home from his (deceased's) cow pen, and a short while before he was killed, and told witness that the defendant, Wash Washington, wanted him, witness, to come to his (defendant's) house on the next morning and write him, defendant, a letter; and in reply to said message from defendant, as above related, witness replied that he could not go on the next morning, but would go on that night; whereupon deceased replied that it was no use to go on that night, as he, deceased, had seen defendant going down the slough with a shot-gun over his shoulder."

The objection urged to this testimony, as appears from the bill of exceptions, is that the same was hearsay, irrelevant and not a part of the *res gestæ*.

Another witness for the State, Jane Clarkson, testified to substantially the same facts, over objection, and the question as to the admissibility and materiality of this evidence is here presented by bills of exceptions duly saved.

It was in evidence that, a short time after this conversation occurred, a shot was fired in the direction of the slough from the witness Jane Clarkson's house; that when the witnesses went to the place where the shot was fired they found the deceased lying just in the edge of the water of the slough, on the road between the house of Jane Clarkson and the house where deceased lived; that deceased was shot with ten or more buck shot. It will be seen from this statement that the evidence objected to tended to show that the defendant was at or near the place of the homicide, and that he had the opportunity and the means of killing the deceased at the time and in the manner it is shown to have occurred.

To be more specific, that part of the conversation objected to is what deceased said about defendant being seen by him going down the slough with a shot-gun. The distance from Clarkson's house to the point on the slough at which deceased was killed is about one hundred yards. Immediately after the conversation between the witnesses and deceased, which took place at Jane Clarkson's house, he, deceased, left, going in the direction of the slough on horseback. This conversation must have occurred within three or four minutes of the time of the homicide, and, as we have seen, within about one hundred yards of the place of the killing.

Was the supposed objectionable evidence *res gestæ?* If so, it was

admissible. If not, under the facts of this case, conceding the testimony to be hearsay and tending to criminate, must the judgment be reversed because of its reception?

. Was the evidence *res gestæ?* We think so. And believing the evidence admissible because constituting what is known as part of the *res gestæ*, there was no error in its admission.

From the third bill of exceptions it appears that the State proved, over the objection of defendant, that Jesse Dupree, Lloyd Brown and Albert Clarkson heard the gun fire and the outcry of deceased, and that they ran to him immediately after the gun fired. Upon reaching deceased they asked him who shot him, whereupon deceased replied, "Wash Washington shot me." Defendant objected because this answer of deceased came within the rule of dying declarations, and that the State had laid no predicate for the reception of dying declarations. Beyond any sort of question, this answer of deceased was strictly competent as *res gestæ*.

We have considered all the bills of exceptions presented in the record, and find no error for which the judgment should be reversed.

In the motion for new trial, it is made to appear that W. P. Marlin, deputy sheriff, and who was a witness for the State, was allowed to take charge of the jury during their deliberations the entire time of the trial. In this we find nothing whatever casting suspicion upon the verdict of the jury.

It is also urged in the motion for new trial that the verdict of the jury is not supported by the evidence. If it be possible to prove the guilt of a party charged with crime, the guilt of this appellant is established. In addition to the conclusive circumstances, independent of his confessions, if a doubt could remain, this doubt is removed by his deliberate and oft repeated confessions, made when he was perfectly free, physically and mentally.

The facts show, beyond any possible doubt, that defendant not only killed Willis Durden, but that the homicide was committed with a sedate, deliberate mind and formed design. Appellant armed himself with a shot-gun, ensconced himself near the slough, and when Willis Durden approached he deliberately and coolly shot him down,— ran from the scene of this terrible assassination, and within a few hours after the homicide, with equal coolness and deliberation, confessed his crime to a number of persons and left the country. Under such a state of facts the jury awarded the highest punishment. In this we think they did right.

We find no error in the judgment and it is therefore affirmed.

*Affirmed.*

[Opinion delivered December 9, 1885.]